UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES ROBERT SIMS,<br><br>Defendant. | CASE NO. CR18-0262JLR<br><br>ORDER DENYING MOTION FOR COMPASSIONATE RELEASE |

## I.  INTRODUCTION

Before the court is Defendant James Robert Sims's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1).  (Mot. (Dkt. # 49).)  Plaintiff United States of America ("the Government") opposes Mr. Sims's motion.  (Resp. (Dkt. # 54).)  Mr. Sims is presently incarcerated at Federal Correctional Institution – Terminal Island ("FCI-Terminal Island"), and he has tested positive for the coronavirus disease of 2019 ("COVID-19").  (*See* Mot. at 2; Resp. at 1, 3.)  The court has considered Mr. Sims's motion, the Government's response, the parties' submissions filed in support of and in

opposition to Mr. Sims's motion, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court DENIES Mr. Sims's motion.

## II.     BACKGROUND

The investigation and prosecution of Mr. Sims began when Federal Bureau of Investigation ("FBI") agents identified Mr. Sims while investigating offenders who were trading in child pornography on an online messaging platform. (*See* PSR (Dkt. # 30) (sealed) ¶ 7.) In September 2018, Mr. Sims began communicating with another platform user who, unbeknownst to Mr. Sims, was an undercover federal agent. (*Id.* ¶ 8; Plea Agreement (Dkt. # 27) at 5-6.) During their communications, Mr. Sims sent the undercover agent several images of children being sexually abused. (PSR ¶ 8; Plea agreement at 6.)) Mr. Sims also claimed during the chats that he had been sexually abusing (and filming the abuse of) a minor relative since the minor relative was a young child. (PSR ¶ 8; Plea Agreement at 6.) Following his arrest, Mr. Sims maintained that any abuse of his minor relative was a fantasy and that he had not actually engaged in this conduct. (PSR ¶ 13; Plea Agreement at 7.) Mr. Sims passed a polygraph examination in which he denied actually abusing his minor relative, and the minor relative did not disclose any abuse when interviewed. (PSR ¶ 14; Plea Agreement at 7.)

---

[1] Mr. Sims requests a telephonic hearing if the court "has questions about Mr. Sims's eligibility for relief under 18 U.S.C. § 3582(c)(1)(A) or the application of relevant [18 U.S.C.] § 3553(a) factors." (Mot. at 16.) Mr. Sims's request does not comply with the court's local rules. *See* Local Rules W.D. Wash. CrR 12(b)(12) ("A party desiring oral argument shall so indicate by typing ORAL ARGUMENT REQUESTED in the caption of the motion or responsive brief."). In any event, however, the court does not have any such questions. *See id.* ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument."). Accordingly, the court denies Mr. Sims's request for a telephonic hearing.

1    After the FBI identified Mr. Sims, agents obtained and executed a search warrant
2 at his home in October 2018. (PSR ¶ 12.) Because Mr. Sims was not at home at the time
3 the agents executed the warrant, he learned of the investigation before meeting with the
4 agents and was able to delete much of the child pornography that he had stored on his
5 iPhone. (*Id.* ¶ 13; Plea agreement at 6-7.) Mr. Sims did agree to meet with agents,
6 however, and was largely cooperative. (*See* PSR ¶ 13.)

7    Mr. Sims was also identified in a separate undercover investigation in which he
8 exchanged messages with a person he believed to be a fifteen-year-old female. (*Id.* ¶ 11;
9 Plea Agreement at 6.) Mr. Sims was actually communicating with another undercover
10 officer posing as a minor. (PSR ¶ 11; Plea Agreement at 6.) Mr. Sims also sent child
11 pornography to this officer who he believed to be a teenage girl and discussed traveling
12 to her location to have sex with her. (PSR ¶ 11; Plea Agreement at 6.)

13   Mr. Sims was arrested and charged with the distribution of child pornography.
14 (*See* Indictment (Dkt. # 13).) He pleaded guilty to possession of child pornography
15 pursuant to the terms of a plea agreement, removing the possibility of a mandatory
16 five-year prison sentence that applies to distribution offenses. (*See* Plea Agreement.) As
17 a part of the agreement, Mr. Sims agreed to submit to and share the results of a
18 psychosexual examination and sexual history polygraph. (*Id.*)

19   On November 12, 2019, the court sentenced Mr. Sims to 34 months of
20 imprisonment and 10 years of supervised release. (Judgment (Dkt. # 39).) He began
21 serving his sentence at FCI - Terminal Island on January 3, 2020, and has completed less
22 than five months of that sentence. When Mr. Sims arrived at FCI – Terminal Island, he

received a health screen. (Mot. Ex. 2 (Dkt. # 50) (sealed) at 17.) He reported a history of asthma with an age onset of 31-40 years. (*Id.*) Mr. Sims is now 47 years old. (*See* PSR at 2.)

The Bureau of Prisons ("BOP") reports a significant outbreak of COVID-19 at FCI – Terminal Island, which at the court's last review included 42 positive inmates, seven positive staff members, nine inmate deaths, 646 recovered inmates, and 10 recovered staff members. *See https://www.bop.gov/coronavirus/* (last visited on May 28, 2020).[2] On April 23, 2020, in coordination with the Los Angeles Department of Public Health, FCI – Terminal Island began testing all inmates for COVID-19 in an effort to stop further spread of the virus. (Resp. at 11, Ex. A.)

On May 7, 2020, Mr. Sims tested positive for the virus that causes COVID-19. (Mot. Ex. 2 at 54; *see also* 5/14/20 S. Sims Decl. (Dkt. # 49-4) ¶ 3.) However, although Mr. Sims has reported experiencing shortness of breath and phlegm at the back of his throat (*see* 5/22/20 S. Sims Decl. (Dkt. # 57-1) ¶¶ 6-7 (indicating that Mr. Sims has reported these symptoms to the declarant, his wife)), his medical records do not indicate that he is suffering from any of the symptoms of COVID-19 at this time (*see* Mot. Ex. 2 at 10-11, 39-40, 47, 58). Mr. Sims is currently in quarantine and being monitored by

---

[2] *See U.S., ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1008 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) ("Under Rule 201, the court can take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as websites run by governmental agencies."); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670, 2008 WL 4183981, *5 (N.D. Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice")).

ORDER - 4

medical staff at FCI – Terminal Island.  (*See generally id.*)  He asked for and received a rescue inhaler for his asthma.  (5/22/20 S. Sims Decl. ¶ 6.)

On April 29, 2020, Mr. Sims wrote in a letter to his wife, Stacey Sims, that he had received paperwork from the Federal Public Defender's Office ("FPDO") to assist him in applying to the warden of his facility for compassionate release but "was ignored by [his] unit manager."  (*See* 5/14/20 S. Sims Decl. ¶ 6; *see also* Hamoudi Decl. (Dkt. # 49-3) at 1.)  Ms. Sims attests that she spoke to Mr. Sims "the following Saturday," which by the court's calculation would be either on May 2, 2020, or May 9, 2020, and Mr. Sims informed her that his request was denied.  (*See* 5/14/20 S. Sims Decl ¶ 6.)  On April 30, 2020, the FPDO submitted another request for Mr. Sims's compassionate release to the warden.  (Hamoudi Decl. at 2.)  On May 14, 2020, Mr. Sims submitted his present motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1) to this court.  (*See generally* Mot.)  The court now considers Mr. Sims motion.

### III.  ANALYSIS

A court generally may not correct or modify a prison sentence once it has been imposed, unless permitted by statute or by Federal Rule of Criminal Procedure 35.  *United States v. Penna*, 315 F.3d 509, 511 (9th Cir. 2003); *see also Dillon v. United States*, 506 U.S. 817, 824-25 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances.") (quoting 18 U.S.C. § 3582(b)).  One such statute is 18 U.S.C. § 3582(c)(1), which governs motions for compassionate release.  *See*

//

1  *United States v. Fuller*, No. CR17-0324JLR, 2020 WL 1847751, at * 2 (W.D. Wash. Apr.

2  13, 2020).

3  Until recently, only BOP could bring a motion for the compassionate release of a

4  prisoner, but the First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1) so that federal

5  prisoners may now seek such release directly from the court.  The statute now provides

6  the court with authority to reduce a sentence upon the motion of an inmate if three

7  conditions are met:  (1) the inmate has either exhausted his or her administrative appeal

8  rights of BOP's failure to bring such a motion on the inmate's behalf or has waited until

9  30 days have lapsed after the applicable warden has received such a request; (2) the

10 inmate has established "extraordinary and compelling reasons" for the requested sentence

11 reduction; and (3) the reduction is consistent with the United States Sentencing

12 Commission's policy statement.  *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also Riley v.*

13 *United States*, No. C19-1522JLR, 2020 WL 1819838, at *5 (W.D. Wash. Apr. 10, 2020).

14 **A.     Exhaustion of Administrative Remedies**

15 The first condition the court considers is whether Mr. Sims has exhausted his

16 administrative remedies.  The statute provides, in relevant part, that the court

17  > upon motion of the defendant after the defendant has fully exhausted all
   > administrative rights to appeal a failure of the Bureau of Prisons to bring a
18 > motion on the defendant's behalf or the lapse of 30 days from the receipt of
   > such a request by the warden of the defendant's facility, whichever is earlier,
19 > may reduce the term of imprisonment.

20 18 U.S.C. § 3582(c)(1)(A).  Mr. Sims "bears the burden of showing that he exhausted his

21 administrative rights with the BOP before filing his compassionate-release motion."

22 *United States v. Van Sickle*, No. CR18-0250JLR, 2020 WL 2219496, at *3 (W.D. Wash.

1  May 7, 2020); *see also United States v. Greenhut*, No. 2:18-CR-00048-CAS-1, 2020 WL
2  509385, at *1 (C.D. Cal. Jan. 31. 2020) (holding that a defendant bears the burden of
3  establishing his or her entitlement to sentencing reduction) (citing *United States v.*
4  *Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)); *United States v. Ebbers*, No.
5  S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) ("The defendant has
6  the burden to show he is entitled to a sentence reduction.") (citing *United States v. Butler*,
7  970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or
8  she has the burden of showing that the circumstances warrant that decrease.")).

9      In support of his position that he has fully exhausted his administrative remedies,
10 Mr. Sims asserts that in late April 2020, he submitted a request for compassionate release
11 to the warden of his facility and that his request was denied by at least May 2 or May 9,
12 2020. (*See* 5/14/20 S. Sims Decl. ¶ 6.) He also submits evidence that the FPDO
13 submitted another request on his behalf to the warden on April 30, 2020. (Hamoudi Decl.
14 at 1-2.) The court credits this evidence but nevertheless concludes that Mr. Sims has
15 failed to exhaust his administrative remedies.

16     First, there is no evidence before the court that the warden ruled on the FPDO's
17 April 30, 2020, request. (*See generally* Dkt.) Yet, Mr. Sims did not wait for the required
18 30 days to lapse before filing his May 14, 2020, motion with the court. *See* 18 U.S.C.
19 § 3582(c)(1)(A). Thus, the April 30, 2020, FPDO request does not fulfill the exhaustion
20 requirements of the statute.

21     Second, although it is possible that Mr. Sims submitted his own request 30 days
22 prior to filing his motion, there is no evidence before the court to confirm that he filed his

request that early.  (*See* 5/14/20 S. Sims Decl. ¶ 6 (indicating that Mr. Sims submitted a request sometime in April 2020).)  Ultimately, however, the date of Mr. Sims's application to the warden does not matter because his request was denied "the following Saturday," which appears to be either May 2 or May 9, 2020.  (*See id.*)  After an inmate's request is denied by the warden, "[t]he inmate may appeal the denial."  *See* 28 C.F.R. § 571.63.  Mr. Sims submits no evidence that he ever appealed the warden's decision.  (*See generally* Dkt.)

Section 3582(c)(1)(A) is clear that a defendant may only file a motion for compassionate release after (1) fully exhausting his "administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or (2) a "lapse of 30 days" from the warden's receipt of the defendant's request.  18 U.S.C. § 3582(c)(1)(A).  The statute does not allow a defendant to short-circuit the BOP's administrative procedures simply by waiting 30 days after filing the request if the warden timely acted on the request.  *United States v. Miller*, No. 2:16-CR-00269-BLW, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020), *reconsideration denied*, No. 2:16-CR-00269-BLW, 2020 WL 2202437 (D. Idaho May 6, 2020).  "In this context 'lapse' clearly means that the warden must fail to act on the defendant's request for a period of 30 days."  *Id.* (citing *Lapse*, Black's Law Dictionary (11th ed. 2019)).  The 30-day period gives the warden time to respond to the inmate's request but prohibits the warden from sitting on the request beyond 30 days.  Thus, the court concludes that neither Mr. Sims's request to the warden for compassionate release nor the FPDO's request fulfills the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A).

This court and other district courts in the Ninth Circuit that have considered this issue have nearly unanimously concluded that failure to exhaust administrative remedies is fatal to a compassionate release motion even in light of the urgency created by COVID-19. *See United States v. Van Sickle*, No. CR18-0250JLR, 2020 WL 2219496, at *4 (W.D. Wash. May 7, 2020) (citing *United States v. Fuller*, No. CR17-0324JLR, 2020 WL 1847751, at *2 (W.D. Wash. Apr. 13, 2020) (citing numerous cases)). Accordingly, the court DENIES Mr. Sims's motion for failure to exhaust his administrative remedies.

**B.     The United States Sentencing Commission's Policy Statement**

In addition, however, even if Mr. Sims did exhaust his administrative remedies, Mr. Sims motion is deficient for a second reason. As noted above, before granting compassionate release, the court must find that the defendant's release is consistent with the United States Sentencing Commission's policy statement. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also Riley*, 2020 WL 1819838, at *5. The Sentencing Commission's policy statement is found in the United States Sentencing Guidelines ("USSG") § 1B1.13.[3] The policy statement provides in relevant part:

> [T]he court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

---

[3] The Sentencing Commission is statutorily required to create the referenced policy statement. *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

(1)(A) Extraordinary and compelling reasons warrant the reduction; or (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) The reduction is consistent with this policy statement.

USSG § 1B1.13. Even if Mr. Sims could demonstrate that his positive test for COVID-19, in combination with his underlying asthma, constitutes "[e]xtraordinary and compelling reasons" warranting his release under subsection (1)(A)[4] and that his release would be consistent with the policy statement under subsection (3), he fails to demonstrate that he "is not a danger to the safety of any other person or to the community" under subsection (2) of USSG § 1B1.13. *See United States v. Gotti*, --- F Supp. 3d ----, 2020 WL 497987, at *6 (Jan. 15, 2020) (concluding that even if a federal prisoner had met his burden of showing eligibility for compassionate release due to his compromised medical condition, the court is not required to release him if he continues to be a danger to community).

In making a determination concerning whether the prisoner continues to be a danger to the safety of any other person or to the community, subsection (2) of USSG § 1B1.13 points the court to the factors listed in 18 U.S.C. § 3142(g). *See* USSG § 1B1.13. Under section 3142(g), relevant factors that the court should consider here include: the nature and circumstances of the crime charged, including whether the

---

[4] Mr. Sims does not qualify for release under subsection (1)(B) because he is not at least 70 years old and he has not served at least 30 years in prison.

offense involves a minor victim, the defendant's history and characteristics, including his character, his physical and mental condition, his family and community ties, his past conduct, and his criminal history. *See* 18 U.S.C. § 3142(g). As discussed below, a review of these factors precludes the court from finding that Mr. Sims is not a danger to the safety of others and the community.

Mr. Sims makes the bold claim that he represents no danger to the community. (Mot. at 14 ("Mr. Sims does not pose a danger to the community if released immediately.").) The court cannot agree. At the time of his arrest, Mr. Sims was not just engaged in possessing pornography, he was sharing that pornography with someone he believed to be an underaged teenager, and he was discussing traveling to her location to engage in sexual activity with her. In other words, he was headed toward escalating, predatory behavior. Such behavior is, without doubt, a danger to the community. *See, e.g.*, *United States v. Smith*, No. 3:16-CR-48 (MPS), 2020 WL 1903160, at *4 (D. Conn. Apr. 17, 2020) (denying motion for compassionate release, despite a heart condition that placed the prisoner at a greater risk of a COVID-19 infection, due to the prisoner's continued danger to the community based in part on his prior offense which included grooming a minor on the internet, sending her pornography, and traveling 2,000 miles to sexually assault her). In addition, although Mr. Sims apparently did not act upon his fantasies prior to his arrest, he bragged repeatedly about sexually abusing a specific minor relative. The court cannot conclude that Mr. Sims release would not pose a danger to this minor individual. *See, e.g.*, *United States v. Miezin*, No. 1:13CR15, 2020 WL 1985042, at *4 (N.D. Ohio Apr. 27, 2020) (denying motion for compassionate release,

despite hypertension and border-line diabetes that placed the prisoner at greater risk of a COVID-19 infection, due to the prisoner's continued danger to the community based in part on the nature of his prior offense which included sharing pornography and bragging about sexual conduct with an underaged boy even though the contact never actually occurred).

Further, Mr. Sims requested relief—home confinement—would not lessen his danger to the community. Mr. Sims's crime does not require anything more than access to the internet. In her proposed "release plan," Ms. Sims discusses plans for managing Mr. Sims's COVID-19 and the risk of transmission to others, as well as plans for his future employment. (*See* 5/14/20 S. Sims Decl ¶¶ 7-11.) However, she fails to discuss how she will monitor and limit Mr. Sims's access to the internet. (*See generally id.*) In today's society with smartphones, tablets, laptops, smart TVs, and countless other devices, it would not be possible to place Mr. Sims in home confinement and eliminate his ability to engage in his prior criminal conduct. Further, the pandemic and the CDC's recommended guidelines would only serve to make it more difficult to monitor Mr. Sims's behavior. Because Ms. Sims could engage in his prior criminal conduct at any time from his place of home confinement, effectively monitoring him would require repeated visits to his home. Such visits would enhance the risk of the spread of COVID-19 to the individuals charged with monitoring his compliance. Based upon the foregoing analysis, the court finds that Mr. Sims would be a danger to the community if he were released. Accordingly, he cannot satisfy the requirements for compassionate release, and the court DENIES his motion on this independent ground as well.

## IV. CONCLUSION

For the reasons set forth above, the court DENIES Ms. Sims's motion for compassionate release (Dkt. # 49).

Dated this 1st day of June, 2020.

JAMES L. ROBART
United States District Judge